## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF VERMONT

| | |
|---|---|
| **MERCHANTS BONDING COMPANY (MUTUAL)**<br><br>**AND**<br><br>**MERCHANTS NATIONAL BONDING, INC.**<br><br>　　　**Plaintiffs,**<br><br>**v.**<br><br>**JEFFREY J. PECK, an individual**<br><br>　　　**Defendant.** | **Civil Action No.: 2:24-cv-00845-cr** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Plaintiffs Merchants Bonding Company (Mutual) and Merchants National Bonding, Inc. (collectively, "Merchants" or "Surety"), by and through their undersigned counsel, and pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, respectfully submit the following Memorandum of Law In Support of their Motion for Preliminary Injunctive Relief, directing Defendant Jeffrey J. Peck ("Defendant" or "Mr. Peck"), to deposit collateral security with the Surety in the amount of $3,388,215.72, to indemnify the Surety for all losses and expenses, including attorneys' fees and consultants' fees, the Surety has incurred, and will continue to incur, as a result of having issued the surety bonds.

For the reasons set forth below, Merchants respectfully request that the Court grant Plaintiffs' Motion for Preliminary Injunctive Relief and order the relief requested therein.

## I.      INTRODUCTION

This case is an indemnity suit in which Merchants seeks to enforce its right to recover losses, costs, and expenses in connection with having issued several surety bonds (the "Bonds") for various entities owned and/or controlled by Mr. Peck, including iSun Industrial, LLC, iSun, Inc., and Peck Electric Co. (collectively, the "iSun Entities"). Merchants filed its Complaint on August 2, 2024, in the present action, asserting claims arising out of a General Indemnity Agreement, and amendment thereto (collectively, the "Indemnity Agreement"), under which Defendant and the iSun Entities (collectively, the "Indemnitors") bound themselves to be jointly and severally liable to Merchants in the event of any loss on the Bonds. The Indemnity Agreement is attached hereto as <u>Exhibit A</u>. The Indemnity Agreement also required Defendant and the iSun Entities to deposit collateral security with Merchants, upon demand, to reimburse Merchants for losses and expenses on any of the Bonds and permitted the Surety to establish a reserve to cover its liability for any loss or expense Indemnitors may be obligated to indemnify Merchants under the Indemnity Agreement. *See* <u>Exhibit A</u>.

As established by the Complaint and the facts set forth in the Affidavit of Shoshana Rothman, Esq., attached hereto as <u>Exhibit B</u>, this Court should order Mr. Peck to deposit collateral security with the Surety in the amount of $ 3,388,215.72, sufficient to indemnify the Surety for all losses and expenses that the Surety has incurred, and will continue to incur, as a result of having issued the surety bonds.

## II.     FACTUAL BACKGROUND

Merchants relies upon the Complaint filed in this action and incorporates the same by reference for purposes of this memorandum.

## THE PARTIES

1.      Plaintiff Merchants Bonding Company (Mutual) is a corporation duly organized and existing under the laws of the State of Iowa with its principal place of business located in West Des Moines, Iowa. *See* Affidavit of Shoshana Rothman, Esq., attached hereto as Exhibit B, ¶ 3.

2.      Plaintiff Merchants National Bonding, Inc. is a corporation duly organized and existing under the laws of the State of Iowa with its principal place of business located in West Des Moines, Iowa. *See id*., ¶ 4.

3.      Upon information and belief, Defendant Jeffrey J. Peck is a citizen of Vermont and resides at 618 Brennan Woods Drive, Williston, Vermont 05495. *See id*., ¶ 5. At all times relevant herein, Jeffrey J. Peck was the CEO of iSun Industrial, LLC and iSun, Inc., and the President of Peck Electric Co. *See id*., ¶ 8.

## THE INDEMNITY AGREEMENT, PROJECTS, AND BONDS

4.      On February 3, 2023, in order to induce Merchants to issue surety bonds, Jeffrey J. Peck, iSun Industrial, LLC, and iSun, Inc. executed the Indemnity Agreement, binding themselves to be jointly and severally liable to Merchants in the event of any loss on any of the surety bonds issued by Merchants. *See* Exhibit A.

5.      On February 21, 2023, Peck Electric Co. executed an Amendment to the Indemnity Agreement, adding Peck Electric Co. as an additional, joint and several corporate indemnitor under the Indemnity Agreement. *See* Exhibit A.

6.      The Indemnity Agreement provides:

SECOND: The [Indemnitors] shall unconditionally indemnify and keep indemnified the [Surety] against any and all liability, loss and expense of whatsoever kind or nature, including, but not limited to, court costs, attorneys' fees, and interest, which the [Surety] may sustain or incur (1) by reason of having executed or procured execution of any Bond or Bonds, (2) by reason of the failure

3

of the [Indemnitors] to perform or comply with this Agreement, or (3) to enforce any of the covenants and conditions of this Agreement.

Exhibit A, pp. 1-2.

       7.      The Indemnity Agreement further provides:

FOURTEENTH: Immediately upon demand, the [Indemnitors] will deposit with the [Surety], as collateral security, money or other collateral satisfactory to the [Surety], equal to (1) the liability of the [Surety], if established; (2) the liability asserted against the [Surety]; or (3) the reserve established by the [Surety], or any increase thereof, to cover any liability for any loss or expense for which the [Indemnitors] may be obligated to indemnify the [Surety] under the terms of this Agreement … The [Surety's] demand shall be sufficient if sent by regular first class, registered or certified mail, by facsimile transmission, electronic mail or digital transmission, or by personal service to the [Indemnitors], regardless of whether actually received.

Exhibit A, pp. 4-5.

       8.      As a direct and proximate result of the Indemnitors executing the Indemnity Agreement, and in reliance thereon, Merchants, as surety, issued the following Payment and Performance Bonds (the "Bonds"):

        The Larson Performance Bond
        Performance Bond No. NME 1133
        Surety: Merchants National Bonding, Inc.
        Principal: iSun Industrial, LLC
        Obligee: BD Solar Larson, LLC c/o BNRG Maine LLC
        Project: BD Solar Larson LLC Design-Solar PV System Engineer, Procure & Install
        Penal Sum: $6,379,144.00
        Date: February 7, 2023

        The Larson Payment Bond
        Payment Bond No. NME 1133
        Surety: Merchants National Bonding, Inc.
        Principal: iSun Industrial, LLC
        Obligee: BD Solar Larson, LLC c/o BNRG Maine LLC
        Project: BD Solar Larson LLC Design-Solar PV System Engineer, Procure & Install
        Penal Sum: $6,379,144.00
        Date: February 7, 2023

<u>The Halladay Performance Bond</u>
Performance Bond No. NVT 1018
Surety: Merchants National Bonding, Inc.
Principal: iSun Industrial, LLC
Obligee: Halladay Solar, LLC c/o Standard Solar, Inc.
Project: MHG Middlebury Halladay–Solar PV System Engineer, Procure and Install
Penal Sum: $3,436,864.30
Date: February 7, 2023

<u>The Halladay Payment Bond</u>
Payment Bond No. NVT 1018
Surety: Merchants National Bonding, Inc.
Principal: iSun Industrial, LLC
Obligee: Halladay Solar, LLC c/o Standard Solar, Inc.
Project: MHG Middlebury Halladay–Solar PV System Engineer, Procure and Install
Penal Sum: $3,436,864.30
Date: February 7, 2023

<u>The Norridgewock Performance Bond</u>
Performance Bond No. NME 1132
Surety: Merchants National Bonding, Inc.
Principal: iSun Industrial, LLC
Obligee: BD Solar Norridgewock, LLC c/o BNRG Maine LLC
Project: BD Solar Norridgewock, LLC Design–Solar PV System Engineer, Procure & Install
Penal Sum: $2,852,165.00
Date: February 7, 2023

<u>The Norridgewock Payment Bond</u>
Payment Bond No. NME 1132
Surety: Merchants National Bonding, Inc.
Principal: iSun Industrial, LLC
Obligee: BD Solar Norridgewock, LLC c/o BNRG Maine LLC
Project: BD Solar Norridgewock, LLC Design–Solar PV System Engineer, Procure & Install
Penal Sum: $2,852,165.00
Date: February 7, 2023

<u>The Neagley and Chase Performance Bond</u>
Subcontract Performance Bond No.: 100000127
Surety: Merchants National Bonding, Inc.
Principal: Peck Electric Co.
Obligee: Neagley and Chase Construction Company
Project: Electrical – ICE Law Enforcement Facility – Project No. 1587
Penal Sum: $1,391,028.00
Date: February 22, 2023

<u>The Neagley and Chase Payment Bond</u>
Subcontract Labor and Material Payment Bond No.: 100000127
Surety: Merchants National Bonding, Inc.
Principal: Peck Electric Co.
Obligee: Neagley and Chase Construction Company
Project: Electrical – ICE Law Enforcement Facility – Project No. 1587
Penal Sum: $1,391,028.00
Date: February 22, 2023

*See* <u>Exhibit B</u>, ¶12. True and correct copies of the Bonds are attached hereto as <u>Exhibit C</u>.

### **THE PRINCIPALS' DEFAULTS, BOND CLAIMS, AND MERCHANTS' LOSSES**

9.      On May 24, 2024, BD Solar Larson, LLC c/o BNRG Maine LLC terminated iSun Industrial, LLC for default. *See* <u>Exhibit B</u>, ¶13.

10.     On May 20, 2024, Halladay Solar, LLC c/o Standard Solar, Inc. terminated iSun Industrial, LLC for convenience. *See id.*

11.     On May 24, 2024, BD Solar Norridgewock, LLC c/o BNRG Maine, LLC terminated iSun Industrial, LLC for default. *See id.*

12.     As a result, the Surety established a loss reserve (the "Reserve") in the amount of $3,200,000.00. *See id.*, ¶14.

13.     As of August 14, 2024, the Surety has received, investigated, and paid the following claims (the "Bond Losses") on Payment Bond No. NME 1133 (the "Larson Payment Bond") out of the Reserve:

| CLAIMANT | LOSSES PAID |
| --- | --- |
| Larkin Enterprises | $1,004,419.50 |
| Haley Ward, Inc. | $2,795.00 |
| Williams Scotsman, Inc. | $3,470.60 |
| Sun-Pull Wire LLC | $159,188.00 |
| Zane Construction LLC | $89,120.18 |
| Scott R. Secrest, PE | $10,512.50 |
| PROLineUtility Construction | $93,317.37 |
| Milliken Brothers, Inc. | $788,149.10 |
| JCL Energy | $86,894.50 |
| QT Corporation | $22,297.00 |

| | |
|---|---|
| Dirigo Surveying | $74,000.00 |
| Also Energy Inc. | $35,934.00 |
| Camp Precast Concrete | $11,050.00 |
| Bancroft Contracting | $5,612.50 |
| Pine Tree Waste, a Casella Co. | $1,992.06 |
| Pine Tree Waste, Inc. | $940.00 |
| Sevee & Maher Engineers, Inc. | $3,876.56 |
| The Cote Corporation | $1,600.00 |
| Straightline Fencing | $69,703.76 |
| Portside Systems, LLC | $61,835.80 |
| **Claims Paid as of 7/15/24** | **$2,526,708.43** |

*See id.*, ¶ 16.

14.     As of August 14, 2024, the Surety has incurred expenses directly resulting from the Bonds, including attorneys' fees and consultants' fees, in the amount of $188,215.72. ("Expense Losses"). *See id.*, ¶ 17.

15.     As of August 14, 2024, the Surety has incurred total Bond Losses and Expense Losses in the amount of $2,714,924.15. *See id.*, ¶ 18.

16.     The Surety reasonably anticipates receiving additional claims against the Bonds, and resolving claims and demands on the Bonds, resulting in further Bond Losses and Expense Losses, and requiring an increase in the Reserve. *See id.*, ¶ 15.

17.     At present, there is $673,291.57 remaining in the Reserve. *See id.*

### MERCHANTS' COLLATERAL DEMAND TO THE INDEMNITORS

18.     As expressly authorized by the Indemnity Agreement, and as a direct result of receiving claims and incurring losses on the Bonds, Merchants issued a collateral demand to the Indemnitors on May 28, 2024 ("Collateral Demand"). *See id.*, ¶ 19. A true and correct copy of the Collateral Demand is attached hereto as Exhibit D.

19.     Pursuant to the express terms of the Indemnity Agreement, and as detailed in the Collateral Demand, the Indemnitors were obligated to immediately: (1) reimburse Merchants for

its losses and expenses incurred as of that date in the amount of $2,560,139.65; and (2) deposit

collateral security with Merchants in the amount of $682,974.07. *See* <u>Exhibit D.</u> Since Merchants

issued the Collateral Demand in May 2024, Merchants' losses and expenses have increased, as

reflected above.

20.     The Indemnitors failed to deposit collateral security with Merchants and provided

no substantive response to Merchants' Collateral Demand in material breach of the Indemnity

Agreement. *See id.*, ¶ 19.

21.     The amount of losses and expenses Merchants has endured is $3,388,215.72 although

that amount will continue to rise, and is comprised of the following: total Bond Losses and Expense

Losses in the amount of $2,714,924.15 and the remaining $673,291.57 left in the Reserve. *See

generally,* <u>Exhibit B</u>.

## III.     STANDARD OF REVIEW

It is well established that a preliminary injunction is "issued to protect plaintiff from

irreparable injury and to preserve the court's power to render a meaningful decision after a trial on

the merits." 11 A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2947 at 121

(1995). A preliminary injunction is intended to preserve the *status quo* between the parties while

the court has the opportunity to decide the case. *Id.* at § 2948, pp. 133-134; *see also Central

Vermont Ry., Inc. v. U.S.,* 231 F. Supp. 967 (D. Vt. 1964).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Lewis v. Lyon,*

2024 WL 1097495, at *2 (D. Vt. Feb. 28, 2024), *report and recommendation adopted*, 2024 WL

1093726 (D. Vt. Mar. 13, 2024) (citing *Winter v. Nat. Res. Def Council, Inc.,* 555 U.S. 7, 20

(2008)). "The district court has wide discretion in determining whether to grant preliminary injunctive relief." *Lewis,* 2024 WL 1097495, at *2 (citing *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 511 (2d Cir. 2005)).

### IV.    ARGUMENT

#### A.    Merchants Are Likely to Succeed on the Merits Because the Indemnity Agreement Is a Binding, Enforceable Contract

To establish a likelihood of success, a plaintiff "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (citing *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985)).

A review of the underlying facts demonstrates that Merchants will likely prevail on the merits in this case. Under Vermont law, ordinary principles of contract law govern this Court's consideration of Defendant's obligations under the Indemnity Agreement. It is well-settled that indemnity agreements, such as the Indemnity Agreement in this case, executed by the Indemnitors, are binding and enforceable contracts, whereby the Indemnitors guaranteed to make the Surety whole for any disbursements by the Surety on the Indemnitors' behalf. *See Berkley Insurance Company v. Bouchard*, 2020 WL 7646542, at *4 (D. Vt. Dec. 23,2020) (citing *Safeco Ins. Co. of Am. v. M.E.S., Inc*, 2010 WL 11627203, at *10 (E.D.N.Y. May 19, 2010)) ("[S]ureties draft their indemnity agreements broadly, and with extensive protections, and the courts…consistently enforce the agreements and the remedies granted to the sureties."); *U.S. Fire Ins. Co. v. Fed. Ins. Co.,* 858 F.2d 882, 884 (2d Cir. 1988) (". . . the right to indemnity springs from an express or implied contract in situations where full, not partial, reimbursement is sought. . . .").

There is no question as to what the Indemnity Agreement says, nor is there any ambiguity that would prevent Defendant from understanding his obligations thereunder. *See Antonio v.*

*Pedersen,* 897 F. Supp. 2d 210, 219 (D. Vt. 2012) ("When presented with an unambiguous contract, Vermont law requires the court to determine the parties' intent from the language of the contract itself, read the contract as a whole, and enforce it in accordance with its terms."); *see also Ogle v. Fid. & Deposit Co. of Maryland*, 586 F.3d 143, 146 (2d Cir. 2009) ("Under contract law, a right to payment based on a written indemnification contract arises at the time the indemnification agreement is executed.").

Under these principles, Defendant is bound by the clear and unambiguous terms of the Indemnity Agreement. Defendant executed the Indemnity Agreement, making him an individual indemnitor, jointly and severally liable to Merchants for any loss on any of the Bonds issued by Merchants. *See* Exhibit A. The Indemnity Agreement explicitly provides:

> SECOND: The [Indemnitors] shall unconditionally indemnify and keep indemnified the [Surety] against any and all liability, loss and expense of whatsoever kind or nature, including, but not limited to, court costs, attorneys' fees, and interest, which the [Surety] may sustain or incur (1) by reason of having executed or procured execution of any Bond or Bonds, (2) by reason of the failure of the [Indemnitors] to perform or comply with this Agreement, or (3) to enforce any of the covenants and conditions of this Agreement.

Exhibit A, pp. 1-2. The Indemnity Agreement further provides:

> FOURTEENTH: Immediately upon demand, the [Indemnitors] will deposit with the [Surety], as collateral security, money or other collateral satisfactory to the [Surety], equal to (1) the liability of the [Surety], if established; (2) the liability asserted against the [Surety]; or (3) the reserve established by the [Surety], or any increase thereof, to cover any liability for any loss or expense for which the [Indemnitors] may be obligated to indemnify the [Surety] under the terms of this Agreement … The [Surety's] demand shall be sufficient if sent by regular first class, registered or certified mail, by facsimile transmission, electronic mail or digital transmission, or by personal service to the [Indemnitors], regardless of whether actually received.

Exhibit A, pp. 4-5.

As a direct and proximate result of the Indemnitors executing the Indemnity Agreement, and in reliance thereon, Merchants, as surety, issued the Bonds. *See* Exhibit B, ¶ 12. As set forth

in Merchants' Complaint, Mr. Peck's entities were deemed to be in default and terminated on two projects for which the Bonds were issued and terminated for convenience on another project. *See id.* at ¶ 13. As a result, and as of August 14, 2024, the Surety has incurred total Bond Losses and Expense Losses in the amount of $2,714,924.15. *See id.* at ¶ 18.

Furthermore, as a direct result of the Bond claims, Bond Losses, and Expense Losses, the Surety established a loss reserve in the amount of $3,200,000.00. *See id.* at ¶ 14. At present, what is left in the loss reserve totals $673,291.57. *See id.* at ¶ 15.

As expressly authorized by the Indemnity Agreement, Merchants issued the Collateral Demand to the Indemnitors on May 28, 2024. *See id.* at ¶ 19; *see also* Exhibit D. Pursuant to the express terms of the Indemnity Agreement, and as detailed in the Collateral Demand, the Indemnitors were obligated to immediately: (1) reimburse Merchants for its losses and expenses incurred as of that date in the amount of $2,560,139.65; and (2) deposit collateral security with Merchants in the amount of $682,974.07. *See* Exhibit D. The Indemnitors failed to deposit collateral security with Merchants and provided no substantive response to Merchants' Collateral Demand in material breach of the Indemnity Agreement. *See* Exhibit B, ¶ 19. Since the issuance of the Collateral Demand, Merchants' losses and expenses have since increased.

Pursuant to the Indemnity Agreement, the Surety is entitled to recover from the Defendant the full amount of its losses and expenses including, without limitation, those losses and expenses not yet incurred but expected to be incurred. *See* Exhibit A. Therefore, on that basis alone, there is a reasonable likelihood that Merchants will succeed on the merits of this case.[1]

---

[1] However, in further support of Plaintiffs' likelihood of success on the merits, we look to the Court's August 2, 2024, Order, granting Merchants' *Ex-Parte* Motion for Writ of Attachment on an emergency basis. In granting Merchant's *Ex-Parte* Motion and issuing the Writ, this Court not only found sufficient support to issue the Writ, but accordingly, found a reasonable likelihood that Merchants would recover judgment in this litigation.

Accordingly, to maintain the *status quo* while the Court has the opportunity to decide this case, the Court should order Defendant to deposit collateral security with the Surety in the amount of $3,388,215.72, sufficient to indemnify the Surety for all losses and expenses, including attorneys' fees and consultants' fees, the Surety may have incurred, and will continue to incur, as a result of having issued the surety bonds.

### B. Merchants Will Suffer Irreparable Harm If Defendant Is Not Ordered to Comply with the Collateral Demand and Deposit Collateral Security

Merchants are entitled to a presumption of irreparable harm. "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).

The combination of the facts set forth below make it reasonably likely that Defendant will deplete or otherwise destroy his assets, leaving insufficient assets to satisfy a judgment in favor of Merchants.[2] If Defendant takes any of these actions, Merchants has no other source of recovery from Defendant—thus, irreparably harming Merchants. Preliminary injunctions are intended for this very type of situation, "to preserve the relative positions of the parties until a trial on the merits [is] held." *University of Texas v. Camenisch,* 451 U.S. 390, 395 (1981); *Central Vermont Ry., Inc.*

---

[2] As previously stated, Merchants filed an *Ex-Parte* Motion for Writ of Attachment with this Court on August 2, 2024. On that same day, the Court granted Merchants' Motion, and signed a Writ of Attachment for all cash interests/assets of Defendant Jeffrey Peck on August 5, 2024, in the amount of $3,310,885.89. Merchants served this Writ on three banks in the State of Vermont, that upon information and belief had bank accounts in the name of Jeffrey J. Peck. *See* Exhibit B, ¶ 22. After service of the Writ of Attachment and coordinating with the respective banks, Merchants is aware that these accounts contain a mere fraction of the value of the Writ. *See id.* On August 16, 2024, Plaintiffs and Defendant filed a Stipulated Motion to Vacate Order and Dissolve Writ of Attachment. Having met and conferred, the Parties reached an agreement, *inter alia*, that the Order should be vacated and the Writ of Attachment should be dissolved pursuant to Vt. R. Civ. P. 4.1(e)(1). The Court granted this Stipulated Motion. Merchants now brings this Motion for Preliminary Injunctive Relief in order to secure the requested relief for all the reasons set forth herein.

*v. U.S.,* 231 F. Supp. 967 (D. Vt. 1964) (injunction justified when there is a risk of irreparable injury and to preserve status quo).

Accordingly, injunctive relief is warranted.

i.    Jeffrey J. Peck is the Principal of Twelve Entities in Bankruptcy.

Mr. Peck's financial risk continues to grow, as he has signed the voluntary Chapter 11 bankruptcy petitions for twelve (12) entities thus far, which further increases the chances his assets will be dissipated by litigation's end. *See* Exhibit B, ¶ 20. All twelve (12) entities filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on June 3, 2024. Those entities, and Mr. Peck's relation thereto, are as follows:

1.    Director of Hudson Solar Service, LLC (Case No, 24-11145-TMH; Voluntary Petition, Document No. 1).

2.    Director of Hudson Valley Clean Energy, LLC (Case No, 24-11146-TMH; Voluntary Petition, Document No. 1).

3.    President of iSun Corporate, LLC (Case No, 24-11147-TMH; Voluntary Petition, Document No. 1).

4.    CEO of iSun Energy LLC (Case No, 24-11148-TMH; Voluntary Petition, Document No. 1).

5.    President of iSun Industrial, LLC (Case No, 24-11149-TMH; Voluntary Petition, Document No. 1).

6.    Director of iSun Residential, Inc. (Case No, 24-11150-TMH; Voluntary Petition, Document No. 1).

7.    Manager of iSun Utility, LLC (Case No, 24-11151-TMH; Voluntary Petition, Document No. 1).

8.    President and CEO of iSun, Inc. (Case No, 24-11144-TMH; Voluntary Petition, Document No. 1).

9.    President of Liberty Electric, Inc. (Case No, 24-11152-TMH; Voluntary Petition, Document No. 1).

10.   President of Peck Electric Co. (Case No, 24-11153-TMH; Voluntary Petition, Document No. 1).

11.   Director of SolarCommunities, Inc. (Case No, 24-11154-TMH; Voluntary Petition, Document No. 1).

12.   Director of Sun CSA 36, LLC (Case No, 24-11155-TMH; Voluntary Petition, Document No. 1).

The risk to Merchants, is that while the relevant entities have filed for bankruptcy proceedings, the automatic stay imposed by 11 U.S.C. § 362 leaves Merchants with one sole indemnitor, Mr. Peck, to pursue for indemnity. This same problem is affecting every other creditor for which Mr. Peck may have guaranteed a bond or loan, or some other distribution of money, and therefore, Mr. Peck remains the only defendant to be pursued while the entities resolve their finances in bankruptcy.

The fact that Mr. Peck has signed the voluntary petitions for all twelve (12) entities in their bankruptcy proceedings further indicates that Mr. Peck's financial obligations are likely spreading him fairly thin. Thus, it is only a matter of time before Mr. Peck has no assets to satisfy the judgment Merchants anticipates in the above-captioned litigation, which would therefore cause Merchants irreparable harm.

        ii.    Jeffrey J. Peck Has Already Proven How Quickly He Can Transfer
               His Own Interests in Real Property.

In January 2023, when Mr. Peck applied to Merchants for surety bonding on behalf of the iSun entities, Mr. Peck provided Merchants with a personal financial statement that identified his

personal holdings in eleven (11) parcels of real estate, primarily in Vermont and Florida. *See* Exhibit B, ¶ 11. Recent asset searches of Mr. Peck disclose that Mr. Peck no longer individually owns any of those properties, but has recently made efforts to transfer the same, although Merchants understands Mr. Peck resides at a primary residence in Vermont. *See id.* at ¶ 21.

Up until July 25, 2024, Mr. Peck also had a second home in Florida (the "Florida Property"). *See id.* at ¶ 21. With respect to the Florida Property, Merchants discovered that on May 10, 2024, just eighteen (18) days before Merchants issued its Collateral Demand, and less than one (1) month before the iSun entities filed for bankruptcy, Mr. Peck, well aware of the financial problems growing before him, made a swift and improper transfer of his interest in the Florida Property.

Specifically, Mr. Peck and his wife, Krista Peck, as Trustees of the Jeffrey J. Peck revocable Trust, jointly owned the Florida Property located at 9865 Bozzano Drive, Delray Beach, FL 33446. *See* the Quitclaim Deed, attached hereto as Exhibit E. On May 10, 2024, the Florida Property was transferred to the Krista A. Peck Revocable Trust. *See* Exhibit E. This Quitclaim Deed thereby moved the Florida Property out of Mr. Peck's revocable trust and into the hands of Mrs. Peck's trust, in consideration of a mere ten dollars ($10.00). *See id.* On July 25, 2024, the Krista A. Peck Revocable Trust sold the Florida Property to third parties for $1,960,000.00. *See* July 25, 2024, Warranty Deed, attached hereto as Exhibit F. This timeline of events can hardly be deemed a coincidence but is instead indicative of an indemnitor who is actively and improperly seeking to shield assets from the reach of Merchants.

Accordingly, Mr. Peck has already exhibited behavior that shows he is capable of swiftly shielding assets from his personal liabilities to avoid said assets falling into the hands of creditors, like Merchants. Not only is Merchants concerned Mr. Peck will dissolve and/or transfer assets

again, but Merchants expects such an occurrence if Mr. Peck were to be given time over the course of litigation, prior to a final judgment, to dissolve and move his assets.

iii.    <u>Confidential Whistleblower Complaint Affiliated with Actions Taken by Jeffrey J. Peck.</u>

Additionally, in the face of Mr. Peck's surmounting financial challenges, there has been a confidential whistleblower complaint filed with the U.S. Securities and Exchange Commission which purports to allege, among other things that: (a) companies for which Mr. Peck was the CEO and Chairman misappropriated funds; and (b) that Mr. Peck recently received a six-figure bonus in the amount of $267,500, while those companies were struggling. *See* "Whistleblower Alleges iSun Leaders Misled Shareholders Ahead of Bankruptcy," attached hereto as <u>Exhibit G</u>.

The fact that such a complaint exists, without needing to know further specifics, illustrates the increasing number of financial (and legal) problems, and the order of magnitude thereof, that Mr. Peck is battling. Thus, in light of these surmounting financial problems for Mr. Peck, Merchants finds it to be reasonably likely that Defendant will deplete, or otherwise destroy, any remaining assets he has, leaving insufficient assets to satisfy a judgment in favor of Merchants.

Accordingly, Merchants files this Motion for Preliminary Injunctive Relief seeking the Court to order Mr. Peck to deposit collateral security with the Surety in the amount of $3,388,215.72, sufficient to indemnify the Surety for all losses and expenses, including attorneys' fees and consultants' fees, the Surety may have incurred, and will continue to incur, as a result of having issued the Bonds.

**C.    The Balance of Hardships Tips Decidedly in Merchants' Favor and The Injunction Is in the Public Interest**

The balance of harm weighs the impact on the Plaintiffs if the injunction is not granted against any possible harm to the Defendant if the preliminary relief is granted. If Merchants are

16

not granted the injunctive relief, there is a sincere likelihood that all of Defendant's assets will be dissolved (or transferred out of his name) by the time a final judgment is issued—leaving Plaintiffs without any assets to satisfy any such judgment. In other words, in the absence of injunctive relief, Merchants would bear the entire loss on the bond claims without being collateralized, a right to which it explicitly bargained for in the Indemnity Agreement. Whereas the effect on Defendant to preliminarily set aside a sum of money that will be paid out to Plaintiffs at dispute's end anyways, is of minimal harm. Defendant was aware of his potential exposure upon issuance of the Bonds. Thus, the likelihood of Plaintiffs' success coupled with the irreparable injury they will suffer if the injunction were not issued is sufficient to show the balance of hardship weighs heavily in favor of the requested relief.

Furthermore, the public interest supports the award of preliminary injunctive relief here. Public policy clearly favors issuance of a preliminary injunction intended to ensure that litigation on an undisputed debt is not a lost cause. Moreover, enforcing the collateral security provision of the Indemnity Agreement encourages sureties to continue to provide bonds for public construction contracts. The public interest also favors an orderly resolution of disputes, rather than allowing a debtor to quickly dissolve and maneuver assets in order to avoid paying judgment in the end.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs Merchants Bonding Company (Mutual) and Merchants National Bonding, Inc. respectfully request that this Court order Defendant Jeffrey J. Peck to deposit collateral security with the Surety in the amount of $3,388,215.72, sufficient to indemnify the Surety for all losses and expenses, including attorneys' fees and consultants' fees, the Surety may have incurred, and will continue to incur, as a result of having issued the surety bonds.

**DATE**: September 5, 2024                    Respectfully submitted,

**MERCHANTS BONDING COMPANY (MUTUAL) AND MERCHANTS NATIONAL BONDING, INC.**

By Counsel:

*/s/ Lisa B. Shelkrot, Esq.*
Erin M. Heins, Esq.
Lisa B. Shelkrot, Esq.
**LANGROCK SPERRY & WOOL**
210 College Street, Suite 400
Burlington, Vermont 05402
Telephone: (802) 864.0217
Facsimile: (802) 864.0137
eheins@langrock.com
lshelkrot@langrock.com

*/s/ Lauren P. McLaughlin, Esq.*
Lauren P. McLaughlin, Esq. (admitted *pro hac vice*)
Ashley P. Cullinan, Esq. (admitted *pro hac vice*)
**SMITH CURRIE OLES LLP**
1921 Gallows Road, Suite 850
Tysons, Virginia 22182
Telephone: (703) 506.1990
Facsimile: (703) 506.1140
lpmclaughlin@smithcurrie.com
apcullinan@smithcurrie.com