**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

| | |
|---|---|
| MERCHANTS BONDING COMPANY (MUTUAL) and MERCHANTS NATIONAL BONDING, INC., | |
| Plaintiffs, | Civil Action No.: 2:24-cv-00845-cr |
| v. | |
| JEFFREY J. PECK, | |
| Defendant. | |

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................... 1

RELEVANT BACKGROUND ...................................................................... 1

ARGUMENT ................................................................................................. 4

   I.    MERCHANTS' BRIEF EXCEEDS THE COURT'S PAGE LIMITATION .................... 4

   II.   LEGAL STANDARDS FOR PRELIMINARY INJUNCTION ..................................... 4

   III.   MERCHANTS FAILS TO MAKE A CLEAR SHOWING OF IRREPARABLE HARM TO SUPPORT ITS MOTION FOR A PRELIMINARY INJUNCTION .................................. 6

   IV.   MERCHANTS HAS FAILED TO MAKE A CLEAR SHOWING THAT IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ............................................... 11

   V.   MERCHANTS HAS FAILED TO CLEARLY SHOW THAT THE BALANCE OF HARDSHIPS FAVORS MERCHANTS OVER PECK ............................................................. 13

   VI.   MERCHANTS HAS FAILED TO CLEARLY SHOW THAT THE PUBLIC INTEREST FAVORS THE ISSUANCE OF THE PRELIMINARY INJUNCTION REQUIRING PECK'S PAYMENT ......................................................................... 14

CONCLUSION .............................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul Wali v. Coughlin*,
  754 F.2d 1015 (2d Cir. 1985)......................................................................................5

*Am. Ctr. for L. & Just.-Ne., Inc. v. Am. Ctr. for L. & Just., Inc.*,
  No. 3:12CV730 JBA, 2012 WL 2374728 (D. Conn. June 22, 2012) .......................6

*Bell & Howell: Mamiya Co. v. Masel Supply Co.*,
  719 F.2d 42 (2d Cir.1983)..........................................................................................6

*Cartin v. Continental Homes of N.H.*,
  134 Vt. 362 (Sup. Ct. 1976)......................................................................................11

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30 (2d Cir.2010)...........................................................................................7

*Est. of Sawyer by Howard Bank v. Crowell*,
  151 Vt. 287 (Sup. Ct. 1989).....................................................................................11

*Grocery Mfrs. Ass'n v. Sorrell*,
  102 F. Supp. 3d 583 (D. Vt. 2015).................................................................4, 5, 6, 7

*Haynes v. Haggerty*,
  Case No. 2:19-cv-164, 2019 WL 7761587 (D. Vt. 2019)...............................7, 9, 10

*Jackson Dairy, Inc. v. H.P. Hood Sons, Inc.*,
  596 F.2d 70 (2d Cir. 1979).........................................................................................6

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
  917 F.2d 75 (2d Cir. 1990).........................................................................................6

*McPherson v. Bellendine*,
  293 Fed. Appx. 22 (2d Cir. 2008)...............................................................................5

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir.2010)...........................................................................................5

*Schnabel v. Nordic Toyota, Inc.*,
  168 Vt. 354 (Sup. Ct. 1998).....................................................................................11

*Sullivan v. Lochearn, Inc.*,
  143 Vt. 150 (Sup. Ct. 1983).....................................................................................11

67904/0001-48480520

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*,
   60 F.3d 27 (2d Cir. 1995)...........................................................................5

*Westchester Disabled On the Move, Inc. v. Cnty. of Westchester*,
   346 F. Supp. 2d 473 (S.D.N.Y. 2004)........................................................5

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)......................................................................................5, 7

**Other Authorities**

District of Vermont Local Rule 7(a)(7) ...........................................................4

District of Vermont Local Rule 7(a)(4)(B)........................................................4

67904/0001-48480520

Defendant Jeffrey Peck ("**Peck**") respectfully submits this memorandum of law in opposition to the motion of Merchants National Bonding (Mutual) and Merchants National Bonding, Inc. (together, "**Merchants**") seeking preliminary injunctive relief.

## PRELIMINARY STATEMENT

By this motion for a preliminary injunction, Merchants is attempting to put the veritable cart before the horse. Merchants is effectively seeking a summary judgment on its claims **and** collection on that judgment – in the millions of dollars – before Peck has even had the opportunity to file a responsive pleading. Merchants fails to make the required clear showing required to obtain the mandatory injunctive relief it seeks. Peck has substantial defenses, including total defenses, to Merchants' claims. He must be permitted to litigate those defenses and potential counterclaims, including the taking of discovery, before the extraordinary mandatory injunctive relief sought by Merchants can properly be considered by the Court. Merchants' perceived concern that it is possible that it may not be able to collect on a future potential judgment is not a sufficient basis upon which to obtain a preliminary mandatory injunction ordering Peck to pay Merchants millions of dollars for indemnification and collateral.

## RELEVANT BACKGROUND

On June 3, 2024, iSun, Inc., a solar energy contractor, and numerous affiliated entities (collectively "iSun") filed Chapter 11 Petitions in the United State Bankruptcy Court for the District of Delaware. *See* Peck Affidavit ("**Peck Aff**"), ¶2. Peck was President and CEO of iSun at that time, and since 2019, and had been President of its predecessor company for years before that. Ibid., Ex. A. In February 2023, Merchants issued payment and performance bonds on four (4) separate solar energy projects on which iSun was the contractor. Id. at ¶3. Relevant to its claim for indemnity against Peck in this case is the BD Solar Larson project located in Scarborough, Maine (the "**Larson Project**") and owned by BNRG Maine LLC ("**BNRG**"). Ibid.

1

Under the Larson Project's payment bond, Merchants alleges it paid out $2,526,708.43 in claims to subcontractors dating back to February 2024. Id. at ¶4. Merchants made such payments because: (1) it believed it was fully secured by the Larson Project's accounts receivable and payments that would come due as the project approached completion; and (2) in the meantime, the subcontractors would continue to perform work and keep the Larson Project proceeding to completion. Ibid. At no time during the course of Merchant's payments to these subcontractors did Merchants make any demands for collateral security to iSun or any of the bond indemnitors, including Peck. Id. at ¶5. It was only after Peck advised Merchants, in good faith, that iSun was contemplating the filing of bankruptcy that it made such demand. Ibid.

The Larson Project is a 6.51 megawatt direct current community solar power facility. Id. at ¶6. BNRG engaged iSun to provide engineering, procurement and construction services for the Larson Project pursuant to a contract dated December 22, 2022 (the "**Larson Contract**"). Ibid., Ex. B. iSun diligently and effectively discharged its obligations under the Larson Contract and timely reached mechanical completion of the Larson Project, though BNRG refused to acknowledge mechanical completion. Id. at ¶7. Throughout the course of iSun's performance of the Larson Project, BNRG was in breach of the Larson Contract by, among other things, failing to make payment when due and owing and failing to timely approve change orders for reasonable extensions of time and payments for required and requested additional work performed by iSun and its subcontractors. Ibid. Merchants was well aware of all of these issues. Ibid.

BNRG's refusal, in bad faith, to acknowledge: (i) iSun had reached mechanical completion; and (ii) BNRG's responsibility for substantial delays throughout the course of the project, resulted in BNRG holding up payments due to iSun (and, therefore, to Merchants), and was used as a pretext to terminate the Larson Contract for cause shortly before the filing of the

2

iSun Chapter 11 cases (which termination Peck believes may have been instigated by Merchants). Id. at ¶8.

In early February 2024, Merchants had required that iSun sign an Irrevocable Letter of Direction ("**ILD**") in connection with the Larson Project and the three other bonded projects. Id. at ¶9. The ILDs provided that "[t]o preserve [Merchant's] rights, including but not limited to, assignment and subrogation rights, [iSun] hereby irrevocably directs that any and all payments due or to become due of any kind or nature on account of the above-referenced Contract entered into by [iSun] and Obligee be made payable to Merchants National Bonding, Inc. by wire transfer…." iSun also consented to Merchants' payment to project subcontractors and suppliers out of those funds – and "to Obligee [project owner] working directly with [Merchants] regarding the investigation relating to the completion and closeout of the Project." Id. at ¶9, Ex. C. Thus, the project owners thereafter, were to make all project payments directly to Merchants, all into a single account, and to deal with Merchants on the closeout of the projects. Ibid.

Merchants had, and continues to have, substantial claims against BNRG in connection with BNRG's material breaches and wrongful termination of the Larson Contract, including, but not limited to, claims for unpaid amounts due under the Larson Contract of about $1,247,657.37, and/or the payment of all of iSun's "Direct Costs" expended on the Larson Project, which may include all amounts Merchants had paid out to subcontractors and fully satisfy Merchants for all amounts otherwise claimed due from Peck. *See* Id. at ¶10 (detailing the amounts due from BNRG).

Further, on July 10, 2024, Merchants advised Peck that BNRG had made two Larson Project progress payments to Merchants into the ILD account in the total amounts of $118,106.36 and $172,221.89, respectively, for a total payment to Merchants of $290,343.25. Id. at ¶12. Yet, although Merchants filed this motion on September 5, 2024, well after receipt of those BNRG

3

payments, it does not appear that Merchants has credited its claim against Peck in that amount. Peck also was advised that at the end of May 2024, Merchant's ILD account had another $97,721.09 in it that was later transferred out, which also does not appear to have been credited against its claim here.  Ibid.

## ARGUMENT

### I.    MERCHANTS' BRIEF EXCEEDS THE COURT'S PAGE LIMITATION

Rule 7(a)(4)(B) of the Local Rules of Civil Procedure for the District of Vermont provides that a memorandum in support of a non-dispositive motion "must not exceed 15 pages, excluding exhibits and attachments."  Merchants' brief in connection with this non-dispositive "preliminary injunction" motion is eighteen (18) pages, excluding it numerous exhibits, thereby exceeding the Court's page limitation by three pages.  Further, Merchants' brief purports to rely "upon the Complaint filed in this action and incorporates the same by reference for purposes of this memorandum."  See Merchants Brf. p. 2.  The Complaint itself is sixteen (16) pages, excluding its exhibits.  Merchants is in clear violation of the Local Rules and its brief should be stricken and re-filed to conform to the Rules.[1]

### II.    LEGAL STANDARDS FOR PRELIMINARY INJUNCTION

"A party 'seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *Grocery*

---

[1] It is also worth noting that Merchants also has failed to comply with Local Rule 7(a)(7), which requires that "[a] party filing a non-dispositive motion must certify that the party has made a good faith attempt to obtain the opposing party's agreement to the requested relief." Merchants' motion contains no such certification, and Merchants did not contact counsel to seek consent of the requested relief.

4

*Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 645 (D. Vt. 2015) (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). "'A preliminary injunction is an extraordinary remedy never awarded as of right.'" Ibid. (quoting *Winter*, 555 U.S. at 24). To obtain a preliminary injunction, a plaintiff must present "persuasive evidence" that it will suffer irreparable harm if it is denied a preliminary injunction but ultimately succeeds on the merits of the case, "with particular attention to" whether remedies available at law, like money damages, would be inadequate to compensate plaintiff for its injury. *Id.* at 646 (quoting *Salinger v. Colting,* 607 F.3d 68, 80 (2d Cir.2010)).

By its motion, Merchants seeks a mandatory injunction, *i.e.*, an injunction that "alter[s] the status quo by commanding some positive act," as opposed to an injunction that "seeks only to maintain the status quo pending a trial on the merits," (*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc*., 60 F.3d 27, 34 (2d Cir. 1995)), or "an injunction [that] will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Westchester Disabled On the Move, Inc. v. Cnty. of Westchester*, 346 F. Supp. 2d 473, 477 (S.D.N.Y. 2004).

When seeking such a mandatory injunction, a movant is held to a higher standard. Specifically, Merchants must make "a more substantial showing of likelihood of success," . . . "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Associates, Inc.*, 60 F.3d at 34 (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)). *See also McPherson v. Bellendine*, 293 Fed. Appx. 22, 24 (2d Cir. 2008) (heightened standard for mandatory injunction).

Perhaps most critically here, Merchants is seeking an injunction requiring the affirmative payment of money, and is effectively conceding in its motion that money damages are adequate to

compensate it for the harm it has suffered.  Where money damages are adequate to compensate the moving party for its harm, injunctive relief is inappropriate.  *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) ("Irreparable injury is one that cannot be redressed through a monetary award.  Where money damages are adequate compensation a preliminary injunction should not issue.").  Consistent with the Second Circuit's mandate, courts routinely deny motions for a preliminary injunction in cases such as this, where the claimant can be compensated with money damages. *See*, *e.g.*, *Jackson Dairy, Inc. v. H.P. Hood Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (vacating a preliminary injunction where the movant "did not demonstrate any likelihood that money would not be adequate compensation."); *Am. Ctr. for L. & Just.-Ne., Inc. v. Am. Ctr. for L. & Just., Inc.*, No. 3:12CV730 JBA, 2012 WL 2374728 (D. Conn. June 22, 2012) (denying a motion for preliminary judgment where the movant's damages were "clearly calculable" and consisted of "payment of the remainder of the funds for [a] contract term . . . and seeks continuation of its contract for another term, as well as damages for breach of contract.").   As set forth below, because Merchants may be compensated for its harm in money damages, and has failed to make a clear showing that extreme damage would occur if Peck did not make full payment to it now or that it is likely to prevail on the merits of the case or that the balance of hardships favor it, its application for mandatory injunctive relief requiring Peck to pay it millions of dollars now must be denied.

III.    **MERCHANTS FAILS TO MAKE A CLEAR SHOWING OF IRREPARABLE HARM TO SUPPORT ITS MOTION FOR A PRELIMINARY INJUNCTION**

In *Sorrell*, supra, 102 F. Supp. 3d at 647, in determining whether the plaintiffs in that case had made a sufficient showing of irreparable harm, this Court stated:

> **Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."** *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983)

(internal quotation marks omitted); *see also Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 37 n. 6 (2d Cir.2010) (noting that "*Winter* reiterates the majority position of the circuits, including [the Second Circuit], that a showing of irreparable harm is fundamental to any grant of injunctive relief"). **Plaintiffs have only identified the "possibility" of harm**, and "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as **an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.**" *Winter,* 555 U.S. at 22, 129 S.Ct. 365 (internal quotation marks omitted). **Accordingly, in the absence of a "clear showing" of irreparable harm, the court proceeds no further with analyzing whether Plaintiffs have satisfied the remaining requirements for preliminary injunctive relief**.

[(emphasis added)]

*See also Haynes v. Haggerty*, Case No. 2:19-cv-164, 2019 WL 7761587, at *2-3 (D. Vt. 2019) (denying preliminary injunction seeking to restrain defendants from disposing of assets because movant had failed to demonstrate irreparable harm as a matter of law, as its underlying claim sought money damages, and therefore, "the court need not consider Plaintiff's likelihood of success on the merits.")

Like the plaintiffs in *Sorrell* and *Haynes*, Merchants has failed to make a clear showing that it will suffer irreparable harm absent the Court ordering Peck's full payment now to Merchants pending the outcome of this litigation, and as such, as in *Sorrell* and *Haynes*, there is no need for the Court to proceed any further with its preliminary injunction analysis. Merchants relies on spurious claims against Peck in attempting to show it may suffer irreparable harm if the Court does not order Peck to affirmatively pay to Merchants the full amount of the damages Merchants is seeking against Peck in this case. Merchants is not simply seeking to maintain the *status quo*, as it asserts, but rather obtain a **mandatory injunction** requiring Peck to pay over to Merchants the amount of its entire claim – not even just as "collateral security" but, mostly, actually, to indemnify Merchants for its alleged losses already paid, the amount of which losses Peck disputes.

7

Merchants' argument that it will not be able to satisfy a potential future judgment obtained in this matter is purely speculative. The collectability of a judgment is a risk taken in every litigation – and Merchants even seemingly admits that it is not clear that Peck has the assets now to satisfy its current demand. In any event, Merchants has not come close to meeting its burden of clearly showing that it will suffer irreparable harm if it fails to obtain the extraordinary relief of requiring Peck to pay its full money damages claim now, rather than at the time of a potential future judgment.

The fact that Peck's co-indemnitors have filed bankruptcy does not provide Merchants with any more rights against Peck than if Peck was the sole indemnitor. It is Merchants that took that credit risk when entering into these transactions with the indemnitor entities and with Peck, and there is no dispute that Merchants failed to obtain any collateral or other security from the indemnitors at the time it entered into the indemnity agreements and issued the subject bonds. Merchants has not shown how the bankruptcies filed by the iSun entities "indicates that Mr. Peck's financial obligations are likely spreading him fairly thin." (Merchants Brf. p. 14). That is nothing but mere speculation. Merchants then states that "it is only a matter of time before Mr. Peck has no assets to satisfy the judgment Merchants anticipates in the above-captioned litigation, which would therefore cause Merchants irreparable harm." Again, Merchants fails to explain how "it is only a matter of time" before Peck has no assets. Whatever Merchants means by that, it is certainly not remotely sufficient to invoke the radical relief it seeks by this motion.

In regard to Merchants' other allegations against Peck, as described in Peck Aff. ¶¶14-18, Peck had provided a worksheet of his assets to his bonding agent and did not intend or know that that worksheet was then going to be transmitted to Merchants (and in fact, did not know Merchants apparently received that worksheet until now). That worksheet listed assets in which Peck either

8

had a direct or beneficial interest **for his agent's reference**. Id. at ¶15.  Peck's agent had indicated to Peck that he thought that the surety might ask Peck to pledge his iSun stock (at the time, Peck's largest single holding), as collateral for the issuance of the bonds.  In the end, however, Merchants did not ask for such stock pledge - or the posting of any other collateral from Peck.  Id. at ¶16.

Moreover, the worksheet was not signed or acknowledged, and, unlike all other personal financial statements Peck had ever signed (typically on a form provided by the financial institution), there was no representation regarding, nor any enumeration of, what his interests were in each of the properties and accounts listed.  Id. at ¶17. A sophisticated bonding company like Merchants could not have reasonably believed that Peck owned each of the listed properties and accounts on that worksheet 100% and in his individual name.  While Merchants claims that Peck "no longer" own any of the eleven (11) properties listed on the statement, it offers no evidence in its motion that Peck had owned those properties individually at the time it received the worksheet and issued the bonds. Id. at ¶18.  Had Merchants performed any due diligence in that regard, it would have determined that Peck did not. Ibid.  In sum, Peck had listed all properties in which he had some personal or beneficial interest at the time (e.g. through a trust, limited liability company, etc.), not in any way representing that he owned those properties individually – or intending that this informal, incomplete and unsigned worksheet be shared directly with, or relied upon by, any surety.  Ibid.

As for the "Florida Property," its transfer and sale were part of long-standing estate and tax planning on advice of Peck's counsel, and not in any way an attempt to avoid a claim by Merchants against him.  Id. at ¶19.  At the time of the initial transfer in early May 2024, which was before any payment demands were made of Peck by Merchants, Peck was still confident that the iSun entities would be able to avoid bankruptcy and he was doing everything in his power to avoid such

9

a filing as that would have only served to adversely impact his and his family's personal wealth. Ibid. Further, Peck and his wife originally met with an agent to sell the Florida Property in March 2024 and it was under contract with the ultimate purchaser before mid-April 2024. Ibid.

Merchants also misstates the original ownership of the Florida Property, despite the fact that the deeds are attached to their motion brief. Specifically, the Florida property had been owned by Peck and his wife, individually (in entireties) **and** as co-trustees of Peck's revocable trust (*see* Merchants' Brf, Ex. E) – and the deed selling the property in July 2024, also was from Peck and his wife, individually (in entireties), and as co-trustees of Peck's wife's revocable trust (*see* Merchants' Brf., Ex .F) – as opposed to ownership solely by the trusts.

To the extent Merchants believes any such transfer was improper, which it was not, there are remedies at law to which it can avail itself in regard to any particular transfer. Again, Merchants is seeking to exercise judgment collection rights well before obtaining a judgment – or even allowing Peck to defend this action on its merits – and without a sufficiently "clear showing" of irreparable harm, rather than just the possibility of irreparable harm.[2]

Accordingly, because Merchants has failed to make a "clear showing" of irreparable harm, rather than a showing of the mere "possibility" of harm, and Merchants ultimately is seeking money damages, the Court need not proceed any further in analyzing whether Merchants has satisfied the remaining requirements for preliminary injunctive relief. Merchants' application should be denied.

---

[2] Further, Merchants' reference to a "Whistleblower Complaint" taken from an article in a local weekly magazine, based on hearsay claims of a former disgruntled officer, is not admissible, is of no probative value and should not be considered by the Court. The alleged complaint makes no claim of wrongdoing against Peck (nor does a separately filed lawsuit by the complainant), and it is irrelevant to the issue of irreparable harm – providing no evidentiary support whatsoever to Merchants' argument that Peck will deplete his assets. *See* Peck Aff., ¶¶22-23.

IV.    **MERCHANTS HAS FAILED TO MAKE A CLEAR SHOWING
THAT IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS
CLAIMS**

Peck has not yet had the opportunity to fully investigate his claims and defenses in regard to Merchants' Complaint, as this case is still in its infancy and no discovery has yet taken place in this matter. However, at the very least, even assuming Peck would otherwise be obligated under the Indemnity Agreement to reimburse Merchants for its payments to iSun's subcontractors on the Larson Project (the bulk of Merchants' claim), Merchants has failed to make reasonable efforts to mitigate its damages and it, therefore, is not likely to succeed on the merits of its claims. And to the extent it has already partially mitigated its claim, it has failed to acknowledge such credits in its application.

The non-breaching party to a contract has a duty to mitigate damages. *See Schnabel v. Nordic Toyota, Inc.*, 168 Vt. 354, (Sup. Ct. 1998), citing *Cartin v. Continental Homes of N.H.,* 134 Vt. 362, 367 (Sup. Ct. 1976) ("There exists a general duty to mitigate damages."); *see also Sullivan v. Lochearn, Inc.,* 143 Vt. 150, 153 (Sup. Ct. 1983) ("Generally, the nonbreaching party does have a duty to make reasonable efforts to mitigate damage."); *Est. of Sawyer by Howard Bank v. Crowell*, 151 Vt. 287, 294 (Sup. Ct. 1989) ("Under contract law, the nonbreaching party in a contract dispute has a duty to make reasonable efforts to mitigate damages arising from the breach.")

As detailed in the accompanying Peck Affidavit, BNRG owes more money on the Larson Contract than Merchants' claim against Peck. Merchants, as it has the right to do, has failed to reasonably assert and prosecute those claims against the rightful debtor, BNRG – both before and after it made demands to Peck for payment and filed this action. Merchants paid out the subcontractor claims because it believed it was fully secured for payments not yet made by BNRG on the Larson Project, and on the other bonded projects, the proceeds of which it was entitled to

11

collect directly into a single account through the Irrevocable Letters of Direction ("**ILDs**"). *See* Peck Aff. ¶9, Ex. C.

As Merchants has argued in submissions to the Delaware Bankruptcy Court, it has priority claims, via subrogation, trust funds and the ILDs, to the collection of contract funds due from the bonded project owners.  Moreover, BNRG's termination of the Larson Contract provides clear rights to collect substantial funds under the Larson Contract – whether the termination was wrongful, as Peck contends, or even if it is determined to be "for cause." *See* Peck Aff. ¶¶10-11 (detailing amounts due from BNRG, which are in excess of amounts claimed due from Peck). Moreover, in previous months, Merchants already has collected over $290,000 directly from Larson Project owner on past due amounts – and possibly, at least another $97,721.09 into its ILD account, yet had not advised the Court in its application of such collection. *See* Peck Aff. ¶12.

At a minimum, Peck should be given the opportunity to take discovery as to all relevant issues in this case, including, but not limited to, Merchant's failure to mitigate its damages and Merchants' contacts with BNRG and other project owners regarding termination of iSun's contracts pre-bankruptcy  - which are relevant to potential claims by Peck against Merchants of bad faith and tortious interference with contract.  Such discovery would include, but not be limited to, a review of all communications between Merchants and BNRG, all internal communications of Merchants relating to the claims and the bonded projects, Merchants' payment and collection efforts from BNRG and the other bonded project owners, an accounting of all bonded project collections and of Merchants' reserve calculations, as well as third-party discovery and depositions on all of those issues.  For all of the foregoing reasons, Merchants has failed to make the required clear showing that is likely to prevail in obtaining a judgment against Peck for the amounts it seeks Peck to pay to it now through this motion.

V.    **MERCHANTS HAS FAILED TO CLEARLY SHOW THAT THE BALANCE OF HARDSHIPS FAVORS MERCHANTS OVER PECK**

In balancing the parties' respective hardships, Merchants argues that absent its requested extraordinary mandatory injunction, there is a "sincere likelihood" that all of Peck's assets will be transferred or dissipated before Merchants can obtain and satisfy a prospective final judgment. And it argues that Peck would suffer no hardship because he would simply be paying over to Merchants what he will ultimately owe when Merchants eventually gets its judgment against him. First, the affirmative payment of money based on the speculative belief and mere possibility that Peck may transfer assets is clearly not the proper basis of a preliminary injunction and for good reason. Requiring Peck to come up with cash in the amount of $3.5 million to pay over to Plaintiffs is an extreme burden in and of itself – particularly when Peck vehemently disputes that he owes or will owe Merchants anywhere near that amount of money, if any at all.

And, in fact, even if Peck owned all of the assets listed on his draft worksheet individually, Peck simply does not have that amount of cash, so he would have to borrow funds and/or sell and liquidate assets to even attempt to satisfy such a payment obligation – or perhaps be forced into filing a personal bankruptcy. Certainly, the hardship in granting the injunction would have severe consequences on Peck, while not granting the injunction, pending judgment, will have little hardship on a surety with hundreds of millions of dollars in surplus[3] that has not even yet obtained a judgment and whose harm would be entirely satisfied by money damages. For the foregoing reasons, Merchants has failed to show that the balance of hardships favors it over Peck – and, in fact, the opposite is true, and as such, Merchants' motion should be denied.

---

[3] *See* https://www.merchantsbonding.com/filesimages/Microsites/Annual-Report-2023/corporate.html

**VI.    MERCHANTS HAS FAILED TO CLEARLY SHOW THAT THE PUBLIC INTEREST FAVORS THE ISSUANCE OF THE PRELIMINARY INJUNCTION REQUIRING PECK'S PAYMENT**

Merchants argues that the debt is "undisputed" so public policy would favor its collection now, rather than waiting for judgment to be entered.  As detailed above and in the Peck Affidavit, however, Merchants' claims in this case are very much disputed.  And relatedly, of course, the court system – and the public policy that goes with it – simply does not operate in the way Merchants suggests.  Parties to a civil litigation are entitled to civil procedures to ensure that they have the opportunity to litigate a dispute fully and fairly, and in the event Merchants were to prevail on its lawsuit and obtain a judgment – only then may it collect on that judgment.

Peck does not take issue with Merchants' argument that public policy favors the "orderly resolution of disputes" – except to note that the orderly resolution of disputes includes the right of a defendant to plead its defenses and potential counterclaims, take discovery to support those defenses and counterclaims, and to dispute a plaintiff's claims at trial. The orderly resolution of a dispute is not ordering a defendant to pre-pay a plaintiff in full on its claims, in the millions of dollars, and then hoping to get that money back if defendant ultimately prevails. For all of these reasons, Merchants has failed to clearly show that the public interest favors the issuance of the injunction and, therefore, its motion should be denied.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that Plaintiffs' Motion for Preliminary Injunctive Relief be denied in its entirety.

67904/0001-48480520

Dated:  September 19, 2024         Respectfully submitted,
       New York, New York

*/s/ Evan J. O'Brien*
Andre Bouffard, Esq.
Evan O'Brien, Esq.
**DOWNS RACHLIN MARTIN**
199 Main Street
Burlington, VT 05402
Telephone: (802) 863-2375
Email:  abouffard@drm.com
        eobrien@drm.com

Daniel F.X. Geoghan, Esq. (*pro hac vice* forthcoming)
Adam Sklar, Esq. (*pro hac vice* forthcoming)
Mark Tsukerman, Esq. (*pro hac vice* forthcoming)
**COLE SCHOTZ P.C.**
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
Email: dgeoghan@coleschotz.com
     asklar@coleschotz.com
     mtsukerman@coleschotz.com

*Counsel for Defendant Jeffrey Peck*

15